STELLA WALLINGFORD, Administratrix of the Estate of R. WALLINGFORD, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—88 S. W. (2d) 361.

Division One, November 12, 1935.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Bert F. Fenn* and *James E. Dame* for respondent.

FERGUSON, C.—Raleigh Wallingford a switchman employed by the defendant in its railroad switch yards in East St. Louis, Illinois, was killed on January 25, 1930, when he fell under a moving train

while engaged in a switching operation. His widow Stella Wallingford as administratrix brought this action for damages under the Federal Employers' Liability Act. It was stipulated and agreed that, at the time, Wallingford "was engaged in his duties as a switchman for the defendant in interstate commerce" and that the Federal Employers' Liability Act applies. The cause was filed, and a trial had, in the Circuit Court of the City of St. Louis. The jury returned a verdict for plaintiff assessing damages in the amount of $10,000 and from the judgment thereon defendant has appealed.

Defendant as appellant here assigns as error; (1) the refusal of the trial court to give an instruction, in the nature of a demurrer to the evidence, directing a verdict for defendant, which defendant requested at the close of all the evidence in the case; (2) the admission, over defendant's objection, of certain evidence which it is alleged was incompetent and highly prejudicial to defendant; and (3) the giving of plaintiff's principal instruction numbered 1 covering the whole case and authorizing a verdict for plaintiff. Of these in order.

 The first assignment necessarily requires a review and examination of the evidence in the light most favorable to plaintiff. It seems the defendant company maintains extensive switch yards and switching facilities in East St. Louis, Illinois. Wallingford was employed as "an extra," that is he was not assigned to any regular place or crew. He worked as "an extra" on a night shift "that started at 11 P. M. and went off at 7 A. M." and would be assigned to some switching crew from which "a regular man" was "off" duty. Wallingford reported for work at eleven P. M. the night of January 24 and was assigned to work as "pin puller" with a certain crew; we shall presently describe his duties as "pin puller." He fell under a moving train and was killed about five-forty-five the morning of January 25 while engaged in the performance of his duties in a switching operation on defendant's track No. 17. Cahokia Creek runs through the yards and is spanned by a wooden railroad bridge in that section or part of the yards involved in this case. The creek runs in a general east and west direction and the bridge north and south. North of the bridge are three parallel north and south switch tracks, numbered from west to east, as 16, 17 and 18. The immediate switching operation in which Wallingford was killed was made on the center track, numbered 17. This track extends south across the bridge. There are three switch stands along the west side of track 17 north of the bridge. A square shaped oil burning lamp is affixed to the top and is a part of each switch stand. These lamps are supposed to be lighted continuously, both night and day. The sides of the lamps are composed of four colored glass reflectors, two red and two green. Including the lamp the stands are about 30 inches in height. The first of the three switch stands mentioned in

the evidence is two or three feet north of the north end of the bridge; the second, commonly referred to as the middle switch stand, is about eighty feet north of the first and the third sixty-eight feet north of the second. All the evidence indicates that the first and third stands were at all the times mentioned, and at the time of the casualty, located approximately, and not less than, five feet. west of the west rail of track 17. Concededly Wallingford fell under the moving cars at a point near or close to the middle switch stand. The distance of that stand from the west rail of track 17 at that time is one of the controverted issues of fact. Plaintiff had testimony that it was not over three feet from the west rail of the track while defendant's evidence was that it was in approximate alignment with the first and third stands and was by actual measurement five feet five inches from the west rail. Defendant's section foreman stated that the minimum standard distance of switch stands from the rail, for this kind of track, was five feet and one inch. It was frequently necessary in the switching operations to ''cut off'' or ''kick'' a car or cars onto another track. In making this movement the train moves at a speed of eight to fifteen miles an hour toward the switch onto which the end car, or cars, is to be ''kicked'' or ''shunted.'' At the proper point the ''pin puller'' operates a lever by means of which the cars which are to be cut off and shunted over the switch to another track are uncoupled from the train and then signals the engineer that the uncoupling has been made whereupon the engine and attached cars are brought to a stop while the cars which have been uncoupled run over the switch onto the other track. The pin puller runs alongside the moving train and operates the uncoupling lever or stands on an iron stirrup under and at the side of the car which is to be uncoupled holding with one hand to a grab iron and from that position operates the uncoupling lever. When the car or cars to be cut off have been uncoupled the pin puller ''drops off'' the moving car. Wallingford fell under the moving cars after a cut off movement had been commenced and without having made the uncoupling. The cars being switched were ''Pacific Fruit Express'' cars which are larger and wider than the ordinary freight car and extend ''almost two feet,'' on each side, beyond the rail. If as plaintiff claimed the middle switch stand was but three feet west of the rail it is apparent that there was hardly a safe and sufficient clearance for a trainman in running alongside of, or standing on the stirrup under and at the side of, cars of such width. Plaintiff's theory as appears by the petition is that defendant ''carelessly and negligently allowed and permitted'' the middle switch stand ''to be placed and remain'' but three feet from the west rail of the track ''and negligently and carelessly failed and neglected to light the lamp on said switch standard and that as a result of said switch standard being in close and dangerous proximity to said track . . . and being dark.

. . . While engaged in switching cars over said track . . .
and while riding or running alongside of a freight car'' Walling-
ford struck ''such switch standard and was thereby caused to lose
his hold and footing on said freight car, or while running alongside
said freight car he ran against said standard, and was caused to fall
to the ground and beneath the moving cars.'' The train being
switched came onto track 17 from the ''ice house track;'' it was
composed of nine or ten of the refrigerator cars above described
pulled by an engine at the south end of the string of cars. The
time ''about 5:45 A. M.'' of a dark January night. Each switchman
carried a lighted lantern by which signals were given. The train
went south and stopped. The engine stopped across and south of
the bridge and the north end of the train was north of, but near
to, the north end of the bridge. The foreman ordered the two cars
on the north end to be ''kicked'' or ''cut off'' and the evidence in-
dicates that they were to be sent over the middle switch. While
standing on the iron stirrup holding with one hand to the grab iron
at the side of the south end of the south car of the two cars which
were to be cut off Wallingford made the uncoupling and the two
cars continued on north and onto the switch; the train, then com-
posed of seven or eight cars and the engine, was brought to a stop;
Wallingford ''dropped off'' the moving car as it rolled away from
the standing train and walked back south to the south end of the
north car of the train preparatory to making another ''cut'' pur-
suant to the foreman's order that after the two cars had been
''cut off'' one car should be cut off and sent over the third or east-
most switch; whether this car, which was, of course, the north car
in the standing train, was south of the middle switch prior to the
commencement of the ''cut off'' or ''kick'' movement is controverted
but we think the circumstances in evidence and calculations arising
upon the evidence would warrant that as a reasonable conclusion.
Defendant's foreman (a witness for defendant) says that when he
gave the signal to commence the ''kick'' of this one car he was
standing west of track 17 and ''something like 100 feet'' from the
north end of the standing train and at one place in cross-examina-
tion states that at the time Wallingford ''was on the south end of
the rear car.'' The substance of the foreman's testimony is that
when from his position 100 feet north of the north end of the train
he gave the engineer the signal to commence the ''kick'' ''Walling-
ford was standing at the south end'' of the north car, which was
to be cut off; that Wallingford ''looked to be'' within about two or
three feet ''of the middle switch'' and ''about two feet north of the
middle switch;'' that Wallingford ''was reaching up for the lad-
der'' and ''had his lamp in that hand;'' that as, in response to his
signal, the movement north got under way Wallingford ''disappeared
and his light disappeared;'' that he thereupon gave a stop signal;

that after the train was brought to a stop Wallingford's dead, mangled and crushed body was found twenty-five or thirty feet north of the middle switch; and that there were four or five cars between the body and the engine. Plaintiff's witness Devine testified that at the time of Wallingford's death he was employed by defendant as a foreman and worked in these yards; that on January 23 he noticed the position of the three switch stands on the west side of track 17 north of the Cahokia Creek bridge; that the first (the one north of the bridge) and the third switch stands were "about five feet" west of the west rail of the track but that the middle stand was only "about three feet" west of the track. Plaintiff's witnesses Nell Hawkins and Walter Hawkins, sister and brother of Mrs. Wallingford, were at the Wallingford home and received with Mrs. Wallingford the report of Wallingford's death about six-thirty A. M., January 25. They testified that they went at once to the yards, arrived there about seven o'clock and learned the approximate place of his death; that they viewed and examined the situation along that part of track 17 where the switching operation was at the time in progress; that they noted the middle switch stand was "nearer to the track than the others;" that they then "stepped off" the distance of each stand from the track and found that while the first and third were "about five and a half feet" west of the track the middle stand was only "about three feet" from the track; that they noted that the lamp on the middle switch stand was bent slightly to the north; that they found a strip or piece of blue overall cloth "caught" in the "latch," "hook" or "clasp" at the top of the lamp on the middle switch; that Walter Hawkins removed and retained the piece of cloth; that no light was burning in either of the three lamps and the lamps were cold; that to further verify their previous findings they returned to the yards on January 28, following the funeral service, at which time they found the middle switch stand "had been moved back" so that it was then five feet or more from the track and in approximate alignment with the first and third stands and that the lamp formerly on the middle stand, which they had formerly observed and examined, had been replaced with a new lamp. Walter Hawkins further testified that on the morning of January 25 following the visit to the yards he went to the undertakers where the body of the deceased Wallingford had been taken and there "compared" the "piece of cloth" which he had found caught in the "clasp" or "hook" at the top of the middle switch lamp with the overalls which Wallingford was wearing at the time and found "it came out of them" and "from the left hip" of the overalls; that he found Wallingford's left hip "was all bruised;" that he placed the piece of cloth in the overalls and wanted to take the overalls but the undertaker "talked me out of it;" that he left the piece of cloth in the overalls but upon returning the next day found that

the undertaker had burned all clothing including the overalls and the piece of cloth which he had placed with the overalls. Defendant had testimony that at the date of Wallingford's death, continuously for many years prior thereto and thereafter to the date of trial the three switch stands had been in the same approximate location each being slightly more than five feet from and west of the west rail of the track; that no change of any kind whatsoever had been made in the middle switch stand after Wallingford's death; that a switch light attendant regularly and daily inspected the switch lamps, kept them supplied with oil and saw that they were lighted; that the light on the first switch stand, the one located a few feet north of the bridge, was not burning during the night of January 24-25 but that the light was burning all that night, and at the time Wallingford fell to his death, on both the middle and the third or northmost stands; that within "twenty or thirty minutes" after Wallingford's death and again at six-forty A. M. separate inspections were made and at both times the middle switch stand was found to be in good condition; the lamp was burning; the lamp was not bent and there was no indication that any object or projection had struck against it nor was any piece of cloth found "hanging" or caught upon the lamp or stand. Defendant seems to recognize that a clearance of at least five feet between the rail of the track and a switch stand as being necessary to safety and whether the middle switch stand was within three feet of the track as plaintiff's evidence placed it or more than five feet distant therefrom according to defendant's evidence was an issue of fact. The cars being switched were wider than the ordinary freight car, extending two feet over the rail, and the fact that the rear or north car which was to be cut off was concededly very close to the middle switch stand when Wallingford fell taken with plaintiff's evidence, that the middle stand was within three feet of the rail, that the lamp was bent to the north, that a piece of cloth torn from the left hip of Wallingford's overalls was found "caught" in the "hook," "clasp" or "latch" at the top of the lamp and that there was a bruise on his left hip, points circumstantially to the conclusion that as Wallingford was about his work preparatory to cutting off the north car he struck or came in contact with this switch stand and was thereby caused to fall under the moving cars. But defendant says that the testimony of its switch foreman that standing west of the track and at least 100 feet north of the north end of the north car he saw Wallingford "reaching up" the side of the car "for the ladder" with his "lamp in that hand," that in that instant, as the cars moved north, Wallingford "disappeared," and that when he was "reaching up" Wallingford was "about two feet north of the middle switch," constitutes positive, direct and conclusive testimony that Wallingford was north and clear of the middle switch before he fell and the proximity of

the switch stand to the track could not have caused him to fall. It must be borne in mind that this casualty happened in the darkness of night. Apparently the switch foreman located Wallingford's whereabouts by the lamp or lantern which Wallingford carried. It taxes credulity to think that at the instant he saw Wallingford "with lamp in that hand" "reaching up," no thought of mishap occurring, he also noted the switch stand and peering through the darkness carefully measured the distance and direction of Wallingford therefrom, at the time, as being two feet north. At most this testimony was but an estimate, calculation or opinion and the credibility, weight and value thereof for the jury. As to the alleged negligence based upon the proximity of the middle switch stand to the track defendant contends that under the evidence it conclusively appears, and that, upon the demurrer to the evidence, we should so declare as a matter of law, that Wallingford assumed the risk. A very similar situation is found in Westover v. Wabash Ry. Co. (Mo.), 6 S. W. (2d) 843, and we there held the question of assumption of risk was for the jury. The extent of Wallingford's previous work, as an extra man, in that part of the extensive yards operated by defendant, his opportunity to know and familiarity with the situation existing there and therefore what he must necessarily have known as to the proximity of the switch stand to the track, the extraordinary width of the particular type of cars which were at the time being switched whereby an insufficient clearance resulted and the extent to which the dangerous situation thus created was obvious made an issue for the jury. As was said in the Westover case, supra, the evidence "disclosed no specific fact or circumstance which must necessarily have brought home to" Wallingford "a knowledge of the dangerous proximity of the switch to the track. . . . Whether the nearness of the switch stand to the track and the danger inherent in their proximity would have inevitably disclosed themselves to a person in respondent's situation was, we think, a question for the jury." On one ground of negligence alleged that defendant "allowed and permitted" the middle switch stand "to be placed and remain" in dangerous proximity to the track we hold a case was made for the jury and therefore the demurrer to the evidence was properly overruled. The sufficiency of the evidence to warrant a submission of negligent failure "to maintain a light on said switch standard at the time" as a separate and distinct ground of recovery will be discussed later.

We come now to appellant's complaint that the trial court erred in admitting certain specified evidence over its objections. Defendant's witness, switch foreman, Lee, had testified at the coroner's inquest. One Block, a stenographer and clerk in defendant's offices, had taken the testimony at the inquest in shorthand, at the coroner's request, and made a typewritten transcript thereof. Defendant called Block as a witness in reference to certain office

records and rules. On cross-examination plaintiff's counsel produced the typewritten transcript of the testimony at the coroner's inquest, had Block identify same, and was then, the repeated objections of defendant thereto being overruled, permitted to read to the jury a question propounded to switch foreman Lee at the inquest and his answer thereto, as same appeared in the typewritten transcript, as follows: "Did you notice when you went back, was the switch light lit or out." Answer: "No it was out" and "Don't think the light would have been of any benefit if it had been lit." Clearly the inference or *innuendo* intended to be conveyed was that Lee had testified at the coroner's inquest that when he "went back" to the middle switch stand, immediately after Wallingford fell to his death, the light on that stand was not burning "and it would not have been of any benefit if it had been." (It will be noted that Lee, as a witness for defendant in this trial, testified that during the night he had observed that the lamp on the first switch stand "was out.") No ground for the impeachment of Lee was laid and plaintiff's counsel specifically stated, at the time he offered this evidence, that it was not offered by way of impeachment. It was first stated that the evidence was offered "as an admission by the defendant" and later as merely "showing the facts in the case." It was not part of the *res gestae*, Lee as a witness was not asked if he had so testified at the coroner's inquest concerning the middle switch light nor was he asked anything about his testimony at the inquest so the excerpt read to the jury was not admissible, nor did or does plaintiff so claim, in impeachment of Lee's testimony as a witness upon this trial and clearly it was not admissible against defendant as an admission. It is apparent that plaintiff sought, and was permitted, to introduce and use the excerpt as original evidence. It was hearsay, its prejudicial nature is evident and the trial court erred in admitting it. ■ Over defendant's objections and exceptions the trial court permitted plaintiff's witness Devine to testify that "shortly before eleven o'clock" of the night of January 23, thirty-one hours before the casualty, the lamp on this switch stand "was out." This presumably was admitted, and relied upon, as a circumstance tending to support plaintiff's theory that the lamp was not burning on the middle switch stand at the time Wallingford fell under the moving train, about five-forty-five A. M. the morning of January 25. As sustaining the propriety of this testimony respondent says: "The persistence of a condition of a continuing nature once shown to exist is presumed." As a general rule "evidence of the condition of a place, property or appliance at or from which an injury . . . is alleged to have occurred, within a reasonable time prior to such injury, is admissible . . . to show the character or condition of such place, property or appliance at the time of the injury." [45 C. J. 1238.] Such rule is applied where the place or appliance

is of a permanent character or the condition of a continuing nature. We have an illustration of the operation of this presumption or inference in the present case. The location of a switch stand is of such a fixed and permanent nature that the testimony of the witnesses that two days before and something more than an hour after the death of Wallingford the stand was located within three feet of the rail constitutes evidence that it was so located at the very time. It is "a condition of a continuing nature" which having been shown to exist within a reasonable time of the accident will be presumed to have existed at that time. While the rule is applicable to defects in substantial structures such as sidewalks, streets, buildings and machinery, it has no application to a purely temporary condition. [Halle Bros. Co. v. Ralls, 19 Ohio App. 427.] The evidence of both plaintiff and defendant was that the lamps were daily inspected, supplied with oil, if needed, and lighted and were supposed to be kept burning at all times. There is not evidence tending to show that the lamp was in any way defective or was not supplied with oil. That the lamp was not burning shortly before eleven o'clock of the night of January 23 was but a temporary condition and would not afford reasonable evidence or basis for an inference that such condition continued and existed at five-forty-five A. M., January 25. We think it too remote. We are not holding that evidence that the light was not burning in this switch stand within a reasonable time immediately before the casualty would not be admissible as a circumstance to be considered with other pertinent facts and circumstances bearing on that question but that the existence of a condition of such a temporary character thirty-one hours or more before the casualty is too remote therefrom to be evidence of the condition at the time.

This leaves as the only evidence in the case in support of the plaintiff's theory that the light in the lamp on the middle switch stand was not burning the testimony of Nell and Walter Hawkins that when they arrived at the yards at about seven o'clock of the morning of January 25, at least an hour and fifteen minutes after Wallingford was killed, that light "was out" and the "lamp was cold." There was no evidence tending to show any defect of a continuing nature, or any other defect, in the lamp itself as accounting for its failure to burn but merely that it was not burning at that time. It was concededly at a time of extremely cold weather so that the fact the lamp was cold is of but the slightest significance as a circumstance tending to show the length of time the light had been out. Upon this testimony plaintiff would again invoke a presumption, or draw an inference, of fact that since the light was out at seven o'clock such condition existed at five-forty-five that morning. In the absence of any other accompanying or corroborating facts or circumstances a finding that the lamp was not burning at five-forty-

five, from this testimony alone, is conjecture and speculation. This testimony standing alone affords but a scintilla of evidence and does not constitute substantial evidence of the fact which it is sought thereby to establish. "The 'scintilla' doctrine is no longer the rule in this jurisdiction. It is exploded here as it is in England . . . and as it is as a Federal doctrine." [Williams v. Kansas City Southern Ry. Co., 257 Mo. 87, l. c. 116, 165 S. W. 788.] Being a case under the Federal Employers' Liability Act the ruling of our Federal courts as to the kind and amount of evidence required to establish negligence governs. It will be remembered that defendant had positive and direct evidence, by the testimony of several witnesses, that the light on the middle switch stand was burning throughout the night, before, at the time of and after the casualty. In view of this evidence as against the inference plaintiff would draw it might be said, borrowing the language of the Federal Supreme Court in Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 77 L. Ed. 819, 53 Sup. Ct. 391, wherein numerous cases of like effect are cited and referred to, that "the desired inference is precluded for the further reason that . . . a particular fact . . . must be inferred from proven facts and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses . . . from which it affirmatively appears that the fact sought to be inferred did not exist." There being no substantial evidence to warrant the submission of failure "to maintain a light on said switch standard at the time the said Wallingford was killed" as a separate ground of negligence such separate submission thereof, in the alternative, in plaintiff's main instruction, numbered 1, covering the whole case and authorizing a finding in favor of plaintiff on either that ground or the dangerous proximity of the switch stand to the track was error.

Appellant complains that the trial court, over its objections, permitted plaintiff's witness Devine to testify that on January 26, the day after Wallingford was killed, "there was a new lamp on this middle switch stand." It will be recalled that plaintiff's witnesses Nell and Walter Hawkins testified that, about seven A. M., January 25, they found the lamp bent slightly to the north. The testimony that on the following day "there was a new lamp" on this switch stand was evidently intended to convey the inference that defendant had likewise discovered the bent condition, though its witnesses denied such condition existed, and sought by removing the lamp and placing a new lamp on the stand to conceal that incriminating circumstance. We might dispose of this complaint by pointing out that the testimony of both Nell and Walter Hawkins that on January 28 they found a new lamp had replaced the lamp which was on the stand on January 25 was admitted without any objection or exception by defendant and in view thereof the like testimony of Devine could hardly

be treated as prejudicial though it was, upon objection, improperly admitted. Appellant's claim that such testimony is inadmissible and prejudicial is based upon the general rule that "evidence is inadmissible to show subsequent repairs of a defect which caused the injury for the purpose of proving negligence," but it is also said in connection with that rule, "such repairs may be shown for various reasons, depending upon the circumstances." [Derrington v. Southern Ry. Co., 328 Mo. 283, 40 S. W. (2d) 1069.] But plaintiff did not claim that the type or kind of lamp used or a defect in the structure thereof, or any other defect in the lamp itself, caused the injury but merely, as one cause thereof, that the lamp was not lighted at the time. It is apparent that the evidence that on the next day "there was a new lamp" on this stand was not for the purpose of showing, or as tending to show, a defect in the lamp itself which caused the injury but was rather a circumstance tending to show, and corroborate plaintiff's claim, that after the accident the lamp was bent to the north and that defendant had sought to conceal that condition by replacing it with a new lamp and for that reason, and as a circumstance, we think the testimony admissible.

Appellant makes other assignments, as for instance prejudicial argument to the jury by counsel for plaintiff, but we do not deem it necessary to discuss them as it is not likely the matters complained of will occur on another trial.

For the reasons stated the judgment of the trial court must be reversed and the cause remanded. It is so ordered. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.