R. C. HUNTER, Plaintiff-Respondent

v.

ST. LOUIS SOUTHWESTERN RAILWAY
COMPANY, a Corporation, Defendant-
Appellant.

No. 46394.

Supreme Court of Missouri,
Division No. 1.
July 14, 1958.
As Modified on Court's Own Motion
Sept. 8, 1958.
Rehearing Denied Sept. 8, 1958.

690

Finley, Lucas & Arnold, Wilder Lucas, Joesph A. Murphy, St. Louis, for appellant.

Sam R. Gardner, Jo B. Gardner, Monett, for respondent (plaintiff).

HOLMAN, Commissioner.

At about 4 a. m. on January 5, 1953, plaintiff sustained personal injuries while on duty as a machinist for the defendant at Jonesboro, Arkansas. This action to recover damages for his injuries was brought under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. A trial resulted in a verdict for plaintiff in the sum of $15,000. Defendant has appealed from the ensuing judgment and here contends (1) that the evidence is insufficient to support the verdict, (2) that the court erred in giving Instructions Nos. 1 and 3 at the request of plaintiff, and (3) that the judgment is excessive.

■ In considering the question of the sufficiency of the evidence to make a submissible case we, of course, view the evidence in the light most favorable to plaintiff. Therefore, to a large extent, we will state the evidence which we consider favorable to plaintiff and will disregard defendant's contrary evidence.

The lines of the defendant (generally referred to as the "Cotton Belt") run in a southwesterly direction from St. Louis, Missouri, into the State of Texas. However, the lines of track we are concerned with in this case run almost due east and west through Jonesboro. The main-line track is the first track on the north side of the area. Immediately south of the main line is located Track No. 1. South of that track is Track No. 2 and other tracks with which we are not here concerned. Plaintiff contends he was injured while working between the main line and Track No. 1 at a point some distance west of the passenger depot.

Plaintiff was 48 years old at trial time. He resided with his wife and children at Pine Bluff, Arkansas, where he had worked for defendant for many years. In the fall of 1952 he was transferred to Jonesboro. He did not move his family to Jonesboro but obtained sleeping quarters and would visit his family in Pine Bluff from time to time. He began work in Jonesboro on the day shift. However, about January 1, 1953, he was assigned to the shift which worked from 11 p. m. to 7 a. m. Plaintiff was working his third night shift at the time he was injured. Generally speaking, his work involved the inspection and repair of diesel locomotives.

Between the main and No. 1 tracks are located watering boxes of two different types. Four of the boxes are for use in adding water to the locomotive generators. There are fifteen boxes of a different type used for supplying drinking water for passenger equipment. These boxes are 18" long, 8½" wide, and extend 16" above the ground. They run parallel with the tracks. One of these passenger watering boxes is said to have caused plaintiff to be injured.

On the morning in question a westbound passenger train arrived in Jonesboro on the main-line track at about 4 a. m. Plaintiff, his helper and his laborer were waiting at the point where the locomotive was to stop. The laborer and helper were required to add water to the engine generator and perhaps perform other duties. It was plaintiff's duty to make an inspection of the locomotive, both inside and outside. It was also necessary to switch the front baggage car out of the train. When the road locomotive was stopped plaintiff boarded it and began his work. While he was making the inside inspection a switching movement was in progress in order to remove the baggage car from the train. To accomplish that, a switch engine was coupled onto the front end of the road engine and the baggage car was uncoupled from the train. The road engine and baggage car were then pulled some distance west so that the baggage car could be switched onto Track No. 1. It was then uncoupled and the switch engine returned the road engine to the train. Shortly thereafter, plaintiff got back on the ground and began his inspection of the outside of the engine. In making that inspection he used a five-cell flashlight and examined the wheels and all of the under part of the engine looking for any defect that might exist in that part of the locomotive.

He began the inspection at the rear of the locomotive on the north side. He then proceeded westwardly along the north side, crossed over the main line, inspecting the front, and proceeded toward the rear on the south side of the engine, walking between the main and No. 1 tracks.

While plaintiff was inspecting the outside of the diesel, the switch engine had apparently backed westwardly to a point where it could cross over to Track No. 1 and couple onto the baggage car. The baggage car was then pushed up Track No. 1 to a point beyond the road engine where it was switched onto Track No. 2 and set out at a steam connection for later unloading. Plaintiff contends that he was struck by the northeast corner of the baggage car as it passed the road engine at a point where one of the passenger watering boxes was located. He testified that in making the inspection it was necessary for him to maintain a certain distance "out away from the engine" in order to see under it. When he came to the watering box (which he had not encountered before) he was about to stumble over it and, in order to avoid that, stepped to the right of the box toward Track No. 1 and the following occurred:

"Q. What, if anything, happened as you went around it? A. A switch engine was pushing the baggage car from behind me and struck me across the back, and just, I managed to get a glimpse of the end of it just as it struck me. * * *

"Q. Did you hear the movement of the car as it came up, or the switch engine, or the bell or whistle, or see any light of any kind? A. No, sir.

"Q. Did anyone shout a warning of any kind to you? A. I didn't hear it.

"Q. Did you know whether it was coming or not? A. No."

In connection with the foregoing, it should be stated that the engine of the road locomotive was operating (idling) all of the time plaintiff was making his inspection and it makes "an awful noise."

Plaintiff testified that as a result of being hit by the baggage car he was knocked unconscious. He described his actions upon regaining consciousness as follows: "Well, first thing I remember, I was trying to, I was laying on the ground trying to move my legs. I was paralyzed. I couldn't move them. I lay there for some time. I don't know how long. I managed to get on my hands and knees, and I was in that position for some time. Then I managed to stand up, and when I stood up, the blood was streaming from my head, all down through my face. Then I managed to get across some rails over to where we had a truck parked, and my helper and a laborer was there. I remember saying something to them." Shortly thereafter, the night foreman ordered that plaintiff be taken to the local hospital where he remained for almost a week. We will hereafter discuss in detail the injuries which plaintiff contends resulted from the foregoing.

■■ The verdict-directing instruction (No. 1), given at the request of plaintiff, conjunctively hypothesized two grounds of negligence as follows: " * * * that there was not sufficient clearance for plaintiff to pass south of said water stand with reasonable safety when a train was moving on the track south of said water stand, and that defendant caused a cut of cars to be shoved easterly along the track next adjacent south of the said road engine without sufficient lights thereon to give reasonable warning of its approach * * *." The cause would be considered submissible if the evidence supports either of said grounds of negligence. Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69. We have concluded that there was sufficient evidence to support the first of said assignments of negligence. In that connection we note that the Supreme Court of the United States has recently said, "Under this statute [F.E.L.A.] the test of a jury case is simply whether the

proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 448, 1 L.Ed.2d 493.

There was evidence that the watering box was located 43 inches from the north rail of Track No. 1, and that the overhang of the baggage car was 28½ inches, which left a clearance of 14½ inches between the box and the car. Plaintiff stated that he measured 20 inches across the shoulders. That evidence would reasonably support a finding that there was insufficient clearance between the box and cars that might be on Track No. 1. There was also evidence that the distance from the water box to the south rail of the main line was 57 inches. It therefore appears that if the water box had been located equidistant between the two tracks, the distance from the box to the rail in each instance would have been 50 inches, and the clearance between the box and a baggage car on either track would have been 21½ inches. From that evidence a jury could reasonably find that the location of the box equidistant would have provided clearance on both sides for a man the size of plaintiff, who, the evidence indicates, weighed 196 pounds, and was 5′ 8″ tall.

Defendant, however, contends that mere proof that the watering box was located in close proximity to Track No. 1 does not prove negligence. Defendant's position is that plaintiff must go further and prove that it was unnecessary for defendant to maintain the box in such close proximity to that track. The cases cited by defendant are Ford v. Dickinson, 280 Mo. 206, 217 S.W. 294, McIntyre v. St. Louis & S. F. R. Co., 286 Mo. 234, 227 S.W. 1047, and Sprankle v. Thompson, Mo.Sup., 243 S.W.2d 510. In general, those cases support a rule which is applicable primarily to platforms and other structures connected with serving industrial plants. In those situations it is often necessary to place tracks so close to buildings, loading platforms, or other structures that an employee cannot pass them with safety on the side of a moving car. "That such situations are inherently dangerous is beyond controversy, but such dangers are incident to the operation of railroads, and do not arise from negligence. It is only when such structures are unnecessarily maintained in dangerous proximity to the tracks that such maintenance constitutes negligence." Ford v. Dickinson, 280 Mo. 206, 217 S.W. 294, 298. The cases cited indicate that in order for an employee to recover for injuries sustained under circumstances such as we have described in the foregoing discussion, there should be proof that the track was maintained unnecessarily close to the obstruction.

However, the rule urged by defendant is not applicable in the situation presented in the instant case. The Ford case indicated that the rule did not apply where a railroad company placed a structure such as a switch post or a fence so near the track as to endanger its employees. See Murphy v. Wabash Railroad Co., 115 Mo. 111, 21 S.W. 862.

In Schultheis v. United Rys. Co., Mo. Sup., 236 S.W. 54, we decided that the rule under discussion did not apply where an employee on the steps of a car was injured when struck by a post which was located close to the track in defendant's yard. Note the following: "In support of its first contention appellant asserts that an engineering question was involved in fixing the relative locations of the tracks and the posts in its terminal yard, and that, in order to establish negligence on its part in that respect, it devolved upon plaintiff to show by the evidence that, under the conditions as they existed in the yard, the post in question could have been set further from the track and still served defendant's purpose. The rule invoked by appellant has been applied in cases where sharp curves in the track

were involved (Tuttle v. [Detroit, G. H. & M.] Railway [Co.], 122 U.S. 189, 7 S.Ct. 1166, 30 L.Ed. 1114), or where tracks were constructed for the purpose of serving industrial plants (Ford v. Dickinson, 280 Mo. 206, 217 S.W. 294), or where both conditions were present (Morris v. Pryor, 272 Mo. 350, 198 S.W. 817). But the doctrine of those cases should be strictly limited unless railroad experts are to be allowed to decide for themselves the questions of their own negligence. Virginian Railway Co. v. Halstead, 4 Cir., 258 F. 428, 169 C.C.A. 444. In the instant case the construction complained of was not used in the service of an industry. The ground was selected and the structures thereon were designed by the defendant itself for its own use as a terminal yard. Common observation teaches that a trolley wire can be supported without posts being set so near the track as to endanger the lives and limbs of persons standing on the steps of moving cars, or while getting on and off the cars." 236 S.W. loc. cit. 56.

■ We accordingly rule that it was not an essential element of plaintiff's case to prove that it was unnecessary for defendant to maintain the instant water box in such close proximity to Track No. 1. Also, as indicated, we think the jury could reasonably have found that defendant was negligent in placing the watering box in a location which did not provide sufficient clearance for plaintiff to pass to the south of same with reasonable safety, under the instant circumstances, and that such negligence played some part in causing plaintiff's injuries. Wallingford v. Terminal R. R. Ass'n of St. Louis, 337 Mo. 1147, 88 S.W.2d 361. In view of the foregoing conclusions we need not determine whether a submissible case was made on the second assignment hypothesized.

Defendant also contends that the evidence was insufficient to support the verdict because there was no admissible evidence to the effect that the neurosis allegedly suffered by plaintiff was proximately caused by the defendant's negligence. There is no merit to that contention. Plaintiff admittedly received some physical injuries on the night in question. Therefore, if the jury could reasonably have found that those injuries resulted from the negligence of defendant he would be entitled to recover some amount of damages. The point made by defendant would seem to relate to the amount of plaintiff's recovery rather than to the question of the submissibility of his case.

Defendant also contends that the court erred in admitting into evidence the opinion testimony of Dr. Ungerman because it was based upon hearsay. Before discussing that point we deem it advisable to review the evidence relating to plaintiff's injuries.

Plaintiff stated that "This whole left side of my head was badly swelled and all skinned up and bruised, you know. And, in fact, my whole head was swelled, but the left side of my head in particular was terribly swelled all out of shape. My nose was broken, lips swelled closed, and my eyes almost closed." He also testified, "I didn't hardly know anything for several days"; that his head was "laid open" by a cut beginning about the hairline and extending backwards; "I remember laying my hand on that place as soon as I stood up. I noticed the blood, and it felt like it was just squashed open. I realized then I had a hard lick about the head." Plaintiff stated further that his upper lip was torn. At the time of receiving his injuries plaintiff apparently fell on his face and some cinders, or coal dust, were ground into the tissues so that when his face had healed there remained areas of bluish discoloration on his upper lip, left cheek, and over his left eye on the forehead.

After being released from the hospital plaintiff remained at home for about two weeks and then went back to work. He stated that he tried to work for five days and then stayed at home for another two weeks. During that time he "hurt bad all up in my head and all down in my right.

shoulder here, and in my neck." He also testified that he had become embarrassed and humiliated about the appearance of his face; that he "had heard several remarks from different ones, 'Boy, who beat the dickens out of that fellow?' 'That fellow certainly did take a beating,' and things like that, that was insulting. I was very sensitive of it. And I received that remark on several occasions, and then I have had people ask me why didn't I wash my face, and, you know, poking jokes at me about it." As a result of that situation he stated that he "didn't want to go out in public at all, and I quit going to church and to lodge, you know, public gatherings altogether."

Plaintiff also related that he "couldn't relax; I couldn't sleep at night, and I'd ache and have to get up at nights and walk around and stomp my feet, and I had a big bottle of aspirin tablets. I took aspirin tablets every so often and tried to get ease. I was tense all the time. And then things looked funny to me, looked like I was walking around in a dream; just felt like I can imagine being hit in the head with a club of some kind." He further stated that he had lost his self-confidence, and "I feel like if I ever leave the company's service, that these places are going to detract from me getting employment anywhere else, especially out meeting the public."

On December 15, 1955, at the suggestion of his attorney, plaintiff was examined by Dr. M. S. Ungerman, a neuropsychiatrist, of Tulsa, Oklahoma, and received treatment from him at regular intervals until October 1956. During all of that time plaintiff was under medication prescribed by Dr. Ungerman, and his condition improved. However, in November 1956, plaintiff stated that he tried to go without the medicine and became so much worse that he had to spend five days in bed. Upon resuming use of the medicine for two or three weeks he became as well as he had been before discontinuing its use. He also stated that since his injury he had been hesitant about his speech. He testified that at trial time he was feeling some better but at no time had he felt as good as he did before receiving the instant injuries.

The deposition of Dr. Ungerman was taken by plaintiff about a month before the trial and was read into evidence. That witness stated that the first time plaintiff came to his office he gave him a complete physical and neurological examination and arrived at a tentative diagnosis of traumatic neurosis. He found the patient to be restless and under a great deal of nervous tension. During the ten months following, the witness saw plaintiff on seven other occasions. The treatment consisted of medication in the form of tranquilizing drugs and long discussions of the problem with plaintiff. After a number of interviews Dr. Ungerman confirmed his original diagnosis and it was noted that plaintiff had definitely improved. However, he expressed the opinion that the difficulty might "flare up" at any time and revert to the original condition and cause such depression that there would be the possibility of self-destruction. He expressed the further opinion that the neurosis created a situation of permanent partial disability. He also expressed the view that if plaintiff had suffered from a pre-existing neurosis, the trauma and resulting disfiguration would have "flared up" or aggravated the existing neurosis.

■ Defendant contends that the court erred in admitting into evidence the opinion testimony of Dr. Ungerman, because it was based upon hearsay. It is said that the traumatic origin of plaintiff's condition, and the fact that the bluish facial discoloration resulted from the trauma, could have been based only upon the hearsay statements of plaintiff. We have said that "A physician, in stating his expert opinion on a patient's condition, may testify to what he personally observed and also to what the patient said (an exception to the hearsay rule) concerning his present, existing symptoms and complaints. However, he may not base his opinion upon or testify to statements of the patient with respect to

past physical conditions, circumstances surrounding the injury, or the manner in which the injury was received." Holmes v. Terminal R. Ass'n of St. Louis, 363 Mo. 1178, 257 S.W.2d 922, 926. In connection with the point under consideration, we note that Dr. Ungerman testified as follows: "I base my opinion and diagnosis of traumatic neurosis on my observation of the patient." However, a consideration of all of Dr. Ungerman's testimony indicates that plaintiff gave him a history of the accident and the resulting effect of same upon his physical and mental condition, and the doctor must have considered those factors in arriving at a diagnosis. Assuming that such was error, we have the view that it was not prejudicial. This, for the reason that the items of hearsay of which defendant complains were properly and fully testified to by plaintiff before the deposition of Dr. Ungerman was offered at the trial. Huffman v. Terminal R. Ass'n of St. Louis, Mo. Sup., 281 S.W.2d 863; Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780.

■ There is no merit in defendant's contention that the court erred in overruling its objection to the hypothetical question propounded to Dr. Ungerman by plaintiff's counsel. The main reason for the objection was that the question failed to include all material facts in evidence. Most of the allegedly omitted facts were not in evidence at that time but were later offered by defendant. Moreover, we note that Dr. Ungerman was later examined, in a hypothetical question asked by defendant's counsel, as to the effect of those facts upon his opinion. We have recently said, "it is not absolutely essential that a hypothetical question should include all material facts supported by evidence. The questioner may frame his hypothetical question on his own theory and may not necessarily include all of the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesizes facts the evidence tends to prove and

fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue." Huffman v. Terminal R. Ass'n of St. Louis, Mo.Sup., 281 S.W.2d 863, 870. We rule this point against defendant.

■ The next point briefed by defendant is that the court erred in giving plaintiff's verdict-directing Instruction No. 1. That instruction hypothesized that if the jury found "defendant had installed and maintained a water stand, and that there was not sufficient clearance for plaintiff to pass south of said water stand with reasonable safety when a train was moving on the track south of said water stand," and that such was negligence, and as a direct result of such negligence plaintiff was struck by the baggage car and was injured, then the verdict should be for plaintiff. Defendant says that it should have also hypothesized that it was not reasonably necessary in the conduct of its business for defendant to have maintained the water box in close proximity to Track No. 1. Since we have heretofore ruled that the fact which defendant contends should have been hypothesized in the instruction was not an essential element of plaintiff's case, it necessarily follows that it was not error to omit it. There is also no merit in defendant's contention that Instruction No. 1 should have hypothesized the facts to show that the alleged injury of January 5, 1953 caused the neurosis, or aggravation thereof, complained of by plaintiff at the trial. The instruction contained the required finding that as a direct result of hypothesized negligence plaintiff "was thereby injured." In the instant circumstances there is no requirement that the instruction hypothesize in detail the various injuries (physical or mental) plaintiff may have received. If he was injured at all, as a direct result of defendant's negligence, he was entitled to recover some amount of damages.

Defendant offered in evidence certain hospital records which indicated that in the years 1940, 1941, and 1949, plaintiff had

entered the railway employees' hospital for brief periods of time for treatment of various complaints which indicated that he was suffering from conditions described as "nervousness," "neurasthenia," and "neurosis." No doubt, as a result of that evidence, and the opinion of Dr. Ungerman that plaintiff's injuries would have aggravated a pre-existing neurosis, plaintiff offered, and the court gave, Instruction No. 3, which reads as follows: "The court instructs the jury that if you find the issues for plaintiff under Instruction No. 1, then even though you may find that plaintiff was suffering from a neurosis or nervous condition prior to January 5, 1953, that is no defense to this action; provided that you further find that such condition, if so, was directly caused to be activated or aggravated by defendant's negligence."

Defendant contends that the giving of that instruction was prejudicial error. It is said that the jury was told, in effect, that defendant had no defense to the action if the jury found that a pre-existing neurosis had been activated by the casualty. It is also contended that the instruction unduly emphasized aggravation of a neurosis as an element of damages. No authorities are cited in support of those contentions.

█ There is no merit in defendant's contention that the instruction directed the jury that defendant had no defense to the action if the jury found that plaintiff had suffered from a pre-existing neurosis which had been activated by the occurrence of January 5, 1953. The instruction did not purport to deal with any defense that defendant might have on the issues concerning its alleged negligence. Its scope was limited to one of the elements of damages. While the instruction was ineptly worded, we have concluded that the jury would not have been misled by it and hence it was not prejudicially erroneous. We have the view that a jury would have understood the instruction to mean that the finding of a pre-existing neurosis would not bar recovery for the neurosis that followed plaintiff's in-

jury if such latter condition was found to be a reactivation of the prior neurosis. It would perhaps have been the better practice to have incorporated that theory into the instruction on measure of damages and to have omitted the instant instruction, but we cannot say that the failure to follow that procedure unduly emphasized aggravation of a neurosis as an element of damages.

█ Finally, defendant contends that the judgment is excessive. In determining that issue we will view the evidence relating thereto in the light most favorable to plaintiff. We have heretofore stated most of the evidence relating to plaintiff's injuries and neurological complaints. We should also mention that defendant offered the testimony of Dr. John C. Faris, of Jonesboro, who treated plaintiff during the week immediately following the casualty. Dr. Faris stated that he noticed that plaintiff had nervous tension characteristics but thought that condition had existed long before the accident. Dr. Ernest H. Parsons, of St. Louis, examined plaintiff in October 1956 at the request of defendant. He testified (for defendant) that in his opinion plaintiff was "perhaps basically a little more tense than the average person" but that he was not "suffering from a neurosis." He also expressed the view that the symptoms of which plaintiff complained "were not related to the injury which he apparently incurred on January 5, 1953."

█ "There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own particular facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries and to the fact that the jury and the trial judge were in a better position than this court to measure an award of reasonable compensation, as well as to the fact that the trial court has approved the verdict in question." Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127.

■ In connection with its contention that the instant verdict is excessive, defendant suggests that plaintiff was guilty of contributory negligence as a matter of law in failing to look toward the west before passing south of the water box and hence this court should determine whether his damages have been diminished accordingly. Without restating the evidence bearing upon that issue, we rule that plaintiff was not guilty of contributory negligence as a matter of law. We therefore need not consider the question as to whether it is within our province to consider contributory negligence (as a matter of law) in determining the issue of excessiveness. See Roderick v. St. Louis Southwestern Ry. Co., Mo.Sup., 299 S.W.2d 422.

It is particularly difficult to fix an amount that will fairly and reasonably compensate plaintiff in the instant case because much of which he complains are subjective matters, such as mental suffering and the neurotic condition which caused plaintiff to experience injured feelings and humiliation resulting from his facial disfiguration. No standard or measure can be found for arriving at reasonable compensation for that type of suffering except the judgment of the so-called reasonable man.

There can be no question but that plaintiff sustained substantial physical injuries upon the occasion in question. Evidence favorable to him would also indicate that he suffered considerable pain for more than a month and some pain, particularly at the base of the neck, for several years thereafter; for a long period of time he was tense, couldn't relax or sleep at night; he definitely suffered substantial facial disfigurement; he suffered from a traumatic neurosis for more than three years, which condition improved upon treatment, but, according to the opinion of Dr. Ungerman, has resulted in a "permanent partial disability." It further appears that plaintiff will have to use medication indefinitely. Plaintiff lost $300 in wages and at trial time had incurred medical expense in the sum of $281.

We have read a number of cases in which the court has considered traumatic neurosis and other forms of mental and nervous suffering in connection with the issue of excessive damages but none of them are sufficiently like the instant one to be of much assistance. For example, see Irwin v. St. Louis-San Francisco R. Co., 325 Mo. 1019, 30 S.W.2d 56, and Williams v. Illinois Cent. R. Co., 360 Mo. 501, 229 S.W.2d 1, 20 A.L.R.2d 322. We have, however, given serious consideration to the case of Roderick v. St. Louis Southwestern Ry. Co., Mo.Sup., 299 S.W.2d 422, in which we refused to hold an award of $15,000 excessive. In that dermatitis case the plaintiff could never work around chromates but he had lost only $150 in earnings at trial time.

■■ It was primarily the function of the jury to assess the amount of plaintiff's damages. Moreover, we are mindful that the trial court had the opportunity to observe plaintiff during the trial (which consumed four days) and also to observe most of the other witnesses who testified, and that court, in overruling the motion for new trial, has approved the amount of the verdict. Under the instant circumstances, we have concluded that we would not be justified in holding the judgment excessive.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.