Elizabeth A. JOLY and Paul M. Joly, Plaintiffs-Appellants-Respondents,

v.

Gary C. WIPPLER, d/b/a Domian's Standard Service, and Charles Emil Mutrux, Defendants-Appellants-Respondents, and
Freda J. Haggard, Defendant-Respondent.

No. 54203.

Supreme Court of Missouri, Division No. 1.

Jan. 12, 1970.

Motion for Rehearing or for Transfer to Court En Banc Denied Feb. 9, 1970.

F. Douglas O'Leary and M. E. Stokes and Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for plaintiffs-appellants-respondents.

Morris, Wuestling & James, William F. James, St. Louis, for defendants-appellants-respondents, Mutrux and Wippler.

Evans & Dixon, John C. Shepherd, St. Louis, for defendant-respondent, Freda J. Haggard.

HOLMAN, Judge.

Plaintiffs, Paul and Elizabeth Joly, were injured in an automobile collision involving the vehicles of defendants. They sued in four counts to recover damages. A trial resulted in a verdict for plaintiffs against all defendants. Paul had a verdict on Count I for his personal injuries in the sum of $32,000 and on Count II in the sum of $4,500 for his damages and loss of consortium because of his wife's injuries. Elizabeth recovered $16,500 on Count III for her personal injuries and $5,500 on Count IV for loss of her husband's consortium. After-trial motions were filed by defendants. The trial court sustained the motion of Freda Haggard for a new trial as to all counts because of error in giving Instructions 3, 5, 7, and 9. The motion of defendants Mutrux and Wippler for a new trial was sustained as to Counts II and IV because of error in giving certain instructions affecting those counts.

Plaintiffs have appealed from the orders granting new trials. Defendants Wippler and Mutrux have appealed from the judgments entered against them on Counts I and III.

The points raised on this appeal do not require a detailed statement of the facts relating to liability. There were two collisions. The collision in which plaintiffs were injured occurred in the right westbound lane of Highway 40, 640 feet east of the point where said highway passes over Ballas Road in St. Louis County. At about 5 p.m. on Saturday, February 6, 1965, Paul was driving west, accompanied by Elizabeth and their infant son, when their car was struck almost headon by an eastbound automobile driven by defendant Haggard. At that place Highway 40 had two lanes for traffic in each direction separated by a 30-foot median strip. Each of the plaintiffs sustained severe injuries and were taken to St. John's Mercy Hospital.

Mrs. Haggard lived in Illinois. She and the four other occupants of her car were enroute to St. John's Hospital to visit a patient. As she drove west on Highway 40 she intended to exit at Ballas Road but missed the turnoff. She drove on for a short distance to a crossover, made a U-turn, and started back east. According to her testimony she intended to turn again at the crossover located 640 feet east of Ballas and then drive west to the exit she had intended to take in the first instance. She testified that when she passed over Ballas she drove into the left lane and at a point about 35 feet from the crossover activated the left-turn signal and had reduced her speed to about 5 to 7 m.p.h. by the time she was turning at the crossover; that she had looked in the rear vision mirror and saw nothing behind her; that as she was making the left turn her car was struck from behind causing it to "shoot across" the median at greatly increased speed and collide with the car occupied by plaintiffs.

Defendant Mutrux was employed by Gary Wippler who operated a service station. At the time in question he was driving one of Wippler's trucks eastbound on Highway 40 towing a station wagon. He testified that as he came over the crest at Ballas, going 55 m.p.h., he saw the Haggard car in the right entrance lane with its left-turn signal on; that it was moving very slowly and first entered the right lane and then when it was 75 feet from the crossover it started entering the left lane; that his truck was then 400 feet from the crossover and he applied his brakes as hard as he could and sounded his horn; that as the Haggard car approached the crossover it stopped "dead still" in the left lane and he was unable to avoid hitting it; that he had considered it unsafe to swerve the truck onto the grass shoulder of the median, and a car on his right side kept him from swerving into the right lane.

■ We will first consider plaintiffs' contention that the court erred in granting defendant Haggard a new trial on all counts because of alleged error in giving Instructions 3, 5, 7, and 9. Those instructions submitted the liability of said defendant as to each count. The submission was in the same language in each instruction so that if one was erroneous they all were. The paragraph involved is as follows: "First, defendant Haggard either: stopped her automobile on the traveled portion of the highway when it was not reasonably safe to do so, or attempted to make a turn when such could not be done in safety and without interfering with other traffic, or moved from the right lane to the left lane when it was not reasonably safe to do so, or failed to keep a careful lookout * * *." This is said to be MAI 17.02, 17.05 [1] (modified). We agree with the ruling of the trial court that the first item submitted in said paragraph was error. This because it was not in the words of the applicable approved instruction. A

1. MAI as used in this opinion refers to the 1964 edition.

committee comment under 17.02 reads: "For other acts or omissions which may be hypothesized, see 17.03 to 17.15." An examination of those forms will reveal that 17.12 is the applicable form for submitting stopping on the highway. It reads, "Defendant suddenly stopped his automobile on the highway without first giving an adequate and timely warning of his intention to stop." The committee obviously considered this to be applicable in a situation like the one before us as it quotes a portion of the applicable statute, § 304.019[2] in the comment.

It was mandatory under S.Ct. Rule 70.-01(b), V.A.M.R., that the applicable MAI submission be given. Since the submission used deviated from 17.12 the giving of the instructions under consideration was error under the provisions of Rule 70.01(c), the prejudicial effect to be judicially determined. Brown v. St. Louis Public Service Co., Mo.Sup., 421 S.W.2d 255. We rule that the submission in question was clearly prejudicial because it omitted the essential element of warning.

The first paragraph of § 304.019 reads as follows: "No person shall stop or suddenly decrease the speed of or turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein." Plaintiffs seek to justify the submission under review because of the construction placed upon the quoted statute by the cases of Reed v. Shelly, Mo.App., 378 S.W.2d 291, and McDaniels v. Hall, Mo. App., 426 S.W.2d 751. Those cases indicate· that the statute imposes two duties upon the motorist, i.e., (1) to ascertain that the movement can be made with reasonable safety, and (2) to then give an appropriate signal. The McDaniels case states that "a negligent failure to observe either thereof, or both, may be asserted as a ground for recovery by a plaintiff, or as a ground of

contributory negligence by a defendant." However, we note that Reed was tried prior to the adoption of MAI and Mc-Daniels involved a submission for which there was no MAI form. We are of the definite opinion, and so rule, that the cases relied on would not authorize a deviation from an approved applicable form such as MAI 17.12 in this instance.

The memorandum of the trial court indicates that it was of the opinion that there were other errors in the submission we have heretofore quoted. We need not rule those matters, however, because, prior to another trial, plaintiffs' attorneys will have an opportunity to redraft the instruction and make any corrections they deem advisable.

■ We also agree that the trial court properly granted defendants Wippler and Mutrux a new trial on the consortium counts (II and IV) because of error in Instructions 4 and 8. These instructions were the same in each submission so that if one was erroneous they both were. The error is contained in the third paragraph of the instruction which (in No. 4) reads, "Third, as a direct result of such negligence, plaintiff Paul Joly's wife was injured and he sustained damage." The difficulty is that the quoted paragraph did not follow MAI 26.04 which is substantially the same except that it concludes with the words "thereby sustained damage." The omission of the word *thereby* caused the instruction to be erroneous and we rule that such was prejudicial because it did not restrict the finding that said plaintiff "sustained damage" to the damage resulting from the injury to his wife. In other words, Paul was also damaged by reason of his own injuries and the instruction given permitted a consideration of that damage in the submission relating to the wife's injuries. We are supported in our ruling by the case of Robben v. Peters, Mo.App., 427 S.W.2d 753.

**2.** Statutory references are to RSMo 1959, V.A.M.S.

We will next consider the appeal of defendants Wippler and Mutrux. Their first contention is that the court erred in failing to grant them a new trial as to Counts I and III because of error in giving Instructions 2 and 6 at the request of plaintiffs. As in other instances these instructions are basically alike so that a ruling on one will apply to both. Instruction 2 which submitted Paul's claim reads as follows:

"Your verdict must be for plaintiff Paul Joly and against defendants Wippler and Mutrux on Count I if you believe: First, defendant Mutrux either: drove the tow truck at an excessive speed, or knew or by the exercise of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have slackened his speed and he failed to do so, and Second, defendant Mutrux's conduct in any one or more of the respects submitted in paragraph First, was negligent, and Third, as a direct result of such negligence plaintiff Paul Joly sustained damage."

The first contention relating to that instruction is that it is prejudicially erroneous because it substituted the word *exercise* for the word *use* as contained in MAI 17.04. That substitution constituted error and we have the duty to determine whether it was prejudicial. While we do not approve of any deviation from the MAI forms, we cannot say that any prejudice resulted in this instance. No doubt because the word *exercise* is used in § 304.-010(1), it has been used in this manner in instructions for many years and jurors have apparently had no difficulty in understanding its meaning. Moreover, when used as verbs, in the context of the instructions under consideration, the words are precisely synonymous. For example, in Black's Law Dictionary, Fourth Edition, "exercise" is defined as "To make use of," and the definition of the word "use" is "To make use of." As indicated, we agree with the ruling of the trial court that this substitution did not constitute prejudicial error.

Defendants Wippler and Mutrux also contend that the instruction heretofore set out was prejudicially erroneous because of the third paragraph thereof which reads, "Third, as a direct result of such negligence plaintiff Paul‾ Joly sustained damage." They say that because there were two joint tort-feasors plaintiffs were required to use one of the optional submissions in MAI 19.01. That form reads as follows:

"When the verdict directing instruction directs a verdict against one of two or more joint tort-feasors, the 'direct result' language of Paragraph Third ‾of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute *either* of the following:

"Third, such negligence directly combined with the acts of (*here describe joint tort-feasor*) to cause damage to plaintiff,

"Third, such negligence directly caused or directly contributed to cause damage to plaintiff."

We do not agree with the stated contention. One of the submissions in 19.01 would have been proper for use by plaintiffs and would have been more beneficial for them than the submission they used. However, no prejudice resulted to defendants Wippler and Mutrux because plaintiffs did not elect to use 19.01. The submission used by plaintiffs placed a greater burden on them as to causation than was required under 19.01. The use of one of the submissions suggested in 19.01 was not mandatory and the defendants involved are in no position to complain of the fact that plaintiffs did not use it.

The final point briefed by defendants Wippler and Mutrux is that Paul's verdict for $32,000 and Elizabeth's verdict for $16,500 are excessive. They say the verdicts are so excessive as to indicate that

they are the result of bias and prejudice on the part of the jury and hence a new trial of those counts should be ordered on all issues. In the alternative, they ask that the excessive verdicts be reduced by requiring remittiturs.

At the outset of our consideration of this matter we will state that we find nothing in the transcript to indicate bias and prejudice on the part of the jury and we accordingly deny the request that a new trial be ordered on all issues. We will, however, carefully consider the contention that the verdicts are excessive and that we should require reductions in the judgments.

■ No precise method has been or can be devised for determining the maximum award which the evidence will support in a given case. Of necessity, each case must be considered upon its own particular facts and seldom do we find two cases where the facts are similar. We should give due regard to the rapidly diminishing purchasing power of the dollar, to the rule of reasonable uniformity of verdicts, and should view the evidence in the light most favorable to plaintiffs. Also, we should not overlook the fact that it is primarily the function of the jury to fix the amount of damages the plaintiffs are entitled to recover, and that both the trial judge and the jury had the opportunity to observe the plaintiffs and the other witnesses during the trial. Moreover, we are mindful that the trial court, in overruling the motion of these defendants for a new trial on Counts I and III, has approved the amount of these verdicts. Kiger v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 311 S.W.2d 5; Hunter v. St. Louis Southwestern Ry. Co., Mo.Sup., 315 S.W.2d 689.

■ We will first consider the $32,000 award to Paul Joly and in so doing will briefly state the evidence relating to the issue of damages. Paul was 39 years old at the time of the accident. He had graduated first in his class at the College of Pharmacy, and for 14 years had been a sales representative for the Upjohn Company. His employment required that he call on physicians, dentists, and druggists and give them detailed information concerning the many drug items manufactured by his employer. Prior to his injury he had a quick mind, was mild-mannered, attentive, and kind. In the collision Paul suffered a head injury and was unconscious at the scene for perhaps 45 minutes. Upon entering the hospital he was suffering from a stiff neck, laceration of the head, a stiff right knee, and pains in his chest. While in the hospital he suffered from severe headaches and at one time "blacked out", or fainted. He was in the hospital for approximately 10 days. The final diagnosis was cerebral concussion, multiple contusions and abrasions, and laceration of the scalp. Upon leaving the hospital he remained at home about two weeks and then returned to part-time work for two or three weeks before resuming full-time employment.

In the weeks following the accident he gradually recovered from his physical injuries. However, he continued to have headaches and experienced a change in his personality. There is an abundance of evidence to indicate that he became tense, nervous, irritable, and was unable to concentrate and had frequent episodes of forgetfulness. In his home life, according to his wife's testimony, he was irritable and would lose his temper quickly; he seemed preoccupied all the time, not interested in carrying on a conversation and was forgetful. In his work, it was his duty to be familiar with the 600 products manufactured by his employer and to be able to detail 50 of those products each year to doctors and druggists. After he returned to work he found that his forgetfulness and inability to concentrate interfered with those presentations and in many instances would find himself unable to continue after starting an interview. One of his customers said he was hesitant and would "grope" for answers. A former neighbor testified that there was no continuity in his conversation; that there were periods of complete silence and lack of ability to continue a conversation. She stated that he

had been "an alert, brilliant, intelligent person," that "now, with his hesitancy, lack of confidence, his lack of continuity, his restlessness, he's quite a different person."

In an effort to improve his situation Paul was given psychological tests and was examined and treated by Dr. Mendelson, a neurologist. On the basis of the history, examination, and two electroencephalograms Dr. Mendelson expressed the opinion that the conditions we have related were the result of the brain injury received in the collision, and that the conditions were permanent.

This plaintiff's loss of salary and personal medical expenses totaled approximately $1,500. His life expectancy was shown to be 31.87 years.

We have read all of the cases cited by the parties but do not find any of them to be very helpful except Duensing v. Huscher, Mo.Sup., 431 S.W.2d 169, which involved a change in the personality of a child as a result of brain damage. We have also considered the analogous cases involving traumatic neurosis such as Hunter v. St. Louis Southwestern Ry. Co., supra. In view of the rapid development of the inflationary trend in this nation judgments being considered today cannot be compared with those rendered several years ago.

It is generally accepted that conditions resulting from injuries to the brain and nervous system can be as painful, disconcerting, and disabling as those resulting from strictly physical injuries. In the instant case we cannot escape the conclusion that Paul's mental and personality changes have greatly handicapped him in his employment and have diminished the enjoyment he would normally receive in his family and social life. After deducting his special damages, the amount of the judgment would provide less than $1,000 per year, as damages, for the period of his life expectancy. While the verdict might be considered to be liberal, we are convinced that it does not exceed the maximum allowable under the evidence and hence is not excessive.

■ We next consider the contention that the $16,000 verdict to Elizabeth Joly is excessive. In the collision her head struck the windshield and broke it. As a result she had a cerebral concussion and a large hematoma of the left forehead described in the evidence as having the appearance of a grapefruit. After other methods failed it was finally necessary to lance this hematoma in order to remove the blood.

Upon entering the hospital it was found that almost her entire body was bruised. Her left hand was quite swollen and her left arm was placed in a pneumatic splint. The calf of her left leg was completely discolored and badly swollen. Her right foot was said to have looked like a club foot because of the swelling. She was kept in the hospital for one month and had to use a walker for several weeks in order to move around after returning home. The left calf was still discolored at the time of trial and a fibrosis had occurred in that area. The Achilles tendon in the left leg was shortened. At the time of trial she still suffered from headaches. She is unable to do housework requiring bending or reaching; she can no longer bathe her children because it is too painful to kneel; when it rains or the weather changes her body aches. Her legs and right foot give her considerable trouble; she can be on her feet for only an hour or two before fatigue and aching occurs and she develops a limp; she has to wear Girl Scout shoes because her feet swell and when she gets up in the morning her legs are numb, although this lasts for a period of only five to eight minutes. She has a lack of stability in walking which makes it difficult for her to walk on an uneven surface. She had a tooth fractured in the accident and when root canal therapy failed to save it, it had to be removed and replaced by an artificial tooth. The evidence indicated that her difficulties and disability were permanent. At the time of the accident she was 42

years old and had a life expectancy of 29.-35 years.

We have concluded that the award to Elizabeth was not excessive. She will likely suffer some pain and disability for the remainder of her life. She will be inconvenienced and handicapped in performing her household and family duties as well as engaging in social activities. In view of the evidence on this issue we cannot confidently say that this verdict exceeded the maximum permissible and therefore, as indicated, rule this point against defendants Wippler and Mutrux.

The orders and judgments of the trial court are affirmed and the case is remanded for a new trial as to all defendants on Counts II and IV, and on Counts I and III as to defendant Haggard on the issue of liability only.

SEILER, P. J., and CARVER, Special Judge, concur.

STORCKMAN, J., not sitting.